IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 23, 2014 Session

## STATE OF TENNESSEE v. BILL SHANNON WILSON

**Appeal from the Criminal Court for Campbell County**
**No. 14512      E. Shayne Sexton, Judge**

_____

### No. E2013-02551-CCA-R3-CD-FILED-SEPTEMBER 18, 2014

_____

A Campbell County jury found the Defendant, Bill Shannon Wilson, guilty of two counts of rape of a child. The trial court sentenced the Defendant to concurrent twenty-year sentences for the convictions. The Defendant asserts that the trial court erred when it: (1) denied the Defendant's motion for judgment of acquittal because the evidence is insufficient to support the convictions; (2) denied the Defendant's motion for new trial in light of newly discovered evidence; (3) denied the Defendant's motion for new trial based upon an "insufficient" indictment; and (4) allowed the State to call a rebuttal witness for the sole purpose of proving collateral matters by extrinsic evidence. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., J., and TIMOTHY L. EASTER, SP. J., joined.

Gregory P. Isaacs and Andrea B. Mohr, Knoxville, Tennessee, for the Appellant, Bill Shannon Wilson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Lori Phillips-Jones, District Attorney General; and Leif E. Jeffers, Assistant District Attorney General for the Appellee, State of Tennessee.

**OPINION**
**I. Background and Facts**

A Campbell County grand jury indicted the Defendant for two counts of rape of a child. At a trial on the charges, the parties presented the following evidence: The victim testified that she was sixteen years old at the time of trial and in her junior year of high school. The victim stated that the Defendant, whom she had known her whole life, was married to her great aunt. She related that she spent time with the Defendant during holiday celebrations, and that she and her older sister, P.S., would "stay the night" at his home.

The victim testified that her birthday is at the end of June. After school had finished in mid-May, but before her twelfth birthday in June of 2007, she spent the day at the Defendant's and her great aunt's house. That night, she, P.S., and the Defendant "went to go ride the four-wheelers around the block." She explained that the Defendant had two four-wheelers, a green one and a blue one. The blue four-wheeler was larger than the green, so she rode on the blue four-wheeler seated behind the Defendant while P.S. drove the green four-wheeler. At some point, the Defendant and the victim became separated from P.S. She described the area saying, "there was a road that went - - you could go straight or you could follow the road and you can turn the curve." This gravel road, "like a little driveway," led down to an area where there was a "big thing of concrete." She identified photographs of the area. One of the pictures depicted a dirt path that the victim said was "basically a four-wheeler trail going down to it, basically a faster way to get down there."

The victim testified that the Defendant drove down the side road that led into a wooded area where "the house used to be" and parked the four-wheeler, "facing back towards the roadway." The victim said that she was familiar with the area because she and her sister had driven the four-wheelers down to this area before. She said that this concrete slab was close to the Defendant's house. The victim said that P.S. had continued on the main road explaining that the Defendant "sped up" leaving P.S. "quite a ways" behind them.

The victim testified that, after the Defendant parked the four-wheeler, he told her that they were "gonna sit down here and talk for a minute." She said that she was seated "sideways" on the four-wheeler while the Defendant was standing. The Defendant touched her knees but "it didn't really bother [her]." She said they talked for a few minutes and then, "[the Defendant] got mad, I guess, and then he just kind of slammed me down on it." The Defendant retrieved two bungee cords from the rear of the four-wheeler and tied the victim's wrists to the handlebars of the four-wheeler. The victim described in detail the bungee cords for the jury. He then pulled the victim's jeans and underwear off and positioned himself over the victim and penetrated the victim's vagina and "started moving." She described his penetration as painful. When he finished, the Defendant told the victim that if she said "anything," he knew where she lived. She said that she initially thought this was a threat but as she thought about it she "wasn't sure how exactly to take that."

The victim testified that the Defendant untied her, threw her clothes at her, and told her to get dressed. The victim said that she didn't say anything to the Defendant, "the first time." She explained that, a few weeks later, but still before her twelfth birthday in June 2007, her mother needed to "take [her] papaw to Murfreesboro," so her mother asked the Defendant if the victim could stay with him while she was away. The victim said that she had not had any contact with the Defendant since the earlier incident. When she learned he was coming to get her, she said she did not "freak out or anything" because she believed it would not happen again. She stated that, at this time, she had not told anyone about the incident because she "felt dirty" and "shameful" like "it was [her] fault."

The victim testified that the Defendant picked up the victim at her home in a "little black Chevrolet truck." On the way to the Defendant's house, he pulled into the same area where the "house had been." She said that the two sat in the truck talking. When they stopped talking, the Defendant leaned over her with one arm on the console and his other arm on the passenger side armrest with his face directly in front of hers and then leaned back over into his seat. She said that the Defendant sat in his seat with his arm still on the console "for a minute or so" and then reached over, unbuttoned her pants, and put his hand down her pants and placed one of his fingers inside of her vagina. The prosecutor asked the victim how she felt when the Defendant did this and the victim replied, "I just felt like - - you know, I thought what - - what honestly am I doing so wrong." She said the Defendant moved his finger "in and out" of her vagina and that it hurt "[a] little." When the Defendant stopped, the victim looked at him and asked "why are you doing this to me[?]" She said that the Defendant just looked at her and then drove to the house.

The victim testified that she spent that night at her great aunt's and the Defendant's house as her mother had planned and that nothing else occurred during her stay. She stated that there had been no sexual contact between her and the Defendant since the incident in the pickup truck. She said that she did not tell her parents immediately because she was afraid that they would be ashamed of her. She said she felt like "it was [her] fault," and she would be blamed for the incidents. She stated that, when she was thirteen years old, she told a friend, Tiffany Hatfield, about the first incident but that the two girls lost contact with one another. Later she recalled seeing a television commercial for "Safe Haven" so she "called, and [she] told a lady about it." When the woman she spoke with on the telephone told her the incidents would have to be reported, the victim said she was ready to report it because she did not "want to live with it on [her] conscience every day." The victim stated that she made this telephone call to Safe Haven in October 2009.

The victim testified that the woman she spoke with on the telephone came to see her the following day and stayed with her while she told her parents. She said that she struggled with telling her family and explained that the impact has been "hard for everybody." She

agreed that she had spoken with detectives about the incidents but that she had not told her sister, P.S., "a whole lot about it."

On cross-examination, the victim maintained she had previously been to the location where the Defendant took her on those two occasions despite her testimony at the preliminary hearing that she had not been there before. The victim said that she did not recall telling Jami Hall and Malea Henegar that, after the first incident and before the second incident, the Defendant called her "several times" threatening to climb through her window and kill her if she told anyone. She also stated that she did not remember telling Ms. Hall that the Defendant called her a "dirty whore" or that P.S. was the first person she told about the incidents when she was thirteen. The victim maintained that she told P.S. after the DCS worker came to her home and she had told her parents. The victim said she did not remember telling Ms. Hall that the Defendant took her home after the first incident because she would not quit crying and that her mother was home at the time and asleep. The victim maintained that she spent the night at the Defendant's residence after the first incident.

Tiffany Hatfield testified that she lived across the street from the victim when the victim was in elementary school. Ms. Hatfield said that she and victim saw each other on a daily basis until the victim told her "something . . . about her being hurt." Ms. Hatfield explained that she had been in "a similar situation" and that, because of this experience, she "couldn't face [the victim] or her mother." She said that the victim was thirteen years old at the time she disclosed the information to Ms. Hatfield and that she had not told anyone what the victim told her because she did not think it was her "place."

Jami Hall, a Campbell County Sheriff's office detective, testified that in January 2010 she accompanied a DCS employee to a high school to interview a fifteen-year old female, the victim. She said that the case was initially reported in October 2009. She also interviewed the Defendant, who denied all allegations, approximately a week after the interview with the victim. The Defendant did admit to owning two four-wheelers and riding one of the four-wheelers with the victim. Detective Hall also confirmed that the Defendant drove a black "S-10" pickup truck. Detective Hall said that the victim described the location of the incidents and that the Defendant told her that the area was a residence that had burned down. Based upon this information she obtained the address through the "911 center" and went out to the location to take photographs.

Detective Hall testified about the warrant in this case. The warrant reflected the year 2005 as when the event occurred. Detective Hall said that the victim never provided an actual year when the events occurred; however, she kept reiterating that she was eleven years old at the time and turning twelve at the end of June. While preparing the warrant, Detective Hall said that she was focused on the victim's being eleven so she wrote down 2005, the year

-4-

the victim turned eleven, rather than the year 2006 when the victim was eleven and turning twelve.

On cross-examination, Detective Hall testified that she presented the year of the alleged rapes incorrectly as 2005, rather than 2006, to the grand jury as she had in the warrant. Detective Hall agreed that some of the victim's testimony at trial was different than what she had told Detective Hall on January 28, 2010. She said that during the January 28, 2010 interview, the victim told her that the Defendant took her home after the first incident. Detective Hall agreed that the victim did not tell her during the January 28, 2010 interview that she had told Tiffany Hatfield about the incidents, but the victim said later that she had told Ms. Hatfield. Detective Hall recalled that the victim had told her that there were two to three weeks between the two incidents and that the Defendant called her during this time to apologize. Detective Hall also agreed that the victim told her that the Defendant's wife had had a hysterectomy and requested the victim come stay with her. Detective Hall said she did not speak with the Defendant's wife to confirm the date of the hysterectomy. Detective Hall confirmed that the victim told her that the Defendant had called the victim several times to threaten to climb through her window and kill her. The victim had also said that the Defendant called her "a dirty whore." Detective Hall agreed that the victim did not testify at trial about those statements by the Defendant. Detective Hall testified that she had spoken with the victim four or five times since the January interview and that the victim had changed some of the "time frame details" or what happened before or after the incidents but that she was consistent as to the specific details of the incidents.

On redirect examination, Detective Hall stated that, in her experience, it was common for witnesses to forget some of the details of a case. Detective Hall stated that the victim's account of the specific details of where the incidents occurred, how old the victim was at the time, and what exactly had happened at that location had not changed.

The State announced the conclusion of its case-in-chief and the Defendant made a motion for a judgment of acquittal as to both counts based upon the victim's inconsistent testimony. The trial court overruled the Defendant's motion.

P.S., the victim's sister who was nineteen years old at the time of trial, testified for the Defendant that the victim had never told her about the two incidents. P.S. denied that she and the victim "periodically" went to the Defendant's house or that there was ever a time that the three of them were four-wheeling and the Defendant pulled off the road and disappeared. P.S. said that the victim had stated on several occasions that she wanted to be on the Maury Povich show some day.

On cross-examination, P.S. stated that she would go over to the Defendant's house but

that the victim would not go "unless she actually - - absolutely had to." She maintained that she, the victim, and the Defendant never rode four-wheelers together. She explained that it was always she and the victim who rode on a four-wheeler together. She stated that she had been "by [the victim's] side" every time she had been around the Defendant "for the whole time she's been alive." P.S. agreed that she was testifying because the Defendant "want[ed] her to." She agreed that the Defendant, along with other family members, had offered to financially help her go to Mexico to be with her boyfriend who was deported. P.S. denied that she had ever been drunk "around" the Defendant or that the Defendant had ever stayed at the house with her and her mother.

The State called S.B., the victim's mother, as a rebuttal witness. S.B. confirmed that the Defendant had stayed at her house. S.B. explained that, one morning when she got up at 5:30 a.m. to go to work, she saw the Defendant's truck parked in her driveway. She looked for the Defendant and found him in P.S.'s room. She stated that she was aware of five or six occasions on which P.S. has been drunk or used alcohol "around" the Defendant. S.B. stated that P.S. was also "drunk on a boat" with the Defendant when she was twelve years old.

Based on this evidence, the jury convicted the Defendant of two counts of rape of a child. The trial court sentenced the Defendant to twenty years for each conviction and ordered these sentences to be served concurrently, for a total effective sentence of twenty years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant asserts that the trial court erred when it: (1) denied the Defendant's motion for judgment of acquittal because the evidence is insufficient to support the convictions; (2) denied the Defendant's motion for new trial in light of newly discovered evidence; (3) denied the Defendant's motion for new trial based upon an "insufficient" indictment; and (4) allowed the State to call a rebuttal witness for the sole purpose of proving collateral matters by extrinsic evidence.

### A. Motion for Judgment of Acquittal

The Defendant claims that the trial court erred when it denied his motion for a judgment of acquittal because the evidence was insufficient to support his convictions. The State responds that the trial court properly denied the Defendant's motion for judgment of acquittal. We agree with the State.

Rule 29 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as follows:

> On Defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(b). This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. *See, generally, Overturf v. State*, 571 S.W.2d 837 (Tenn.1978). By presenting evidence, however, a defendant generally waives his ability to appeal a trial court's mid-trial denial of his motion for a judgment of acquittal. *Finch v. State*, 226 S.W.3d 307, 317 (Tenn. 2007).

In this case, the trial court denied the Defendant's motion for judgment of acquittal raised at the close of the State's proof. Following this denial, the Defendant presented evidence. The Defendant, therefore, waived his right to appeal the denial of his motion for judgment of acquittal raised at the close of the State's proof. *Id*. at 317.

### B. Newly Discovered Evidence

The Defendant asserts that the trial court erred in denying his motion for new trial in light of newly discovered evidence that was not available at the time of trial. The Defendant produced testimony that the victim and S.B. had recanted their trial testimony. The State responds that the trial court did not abuse its discretion when it found that the testimony regarding the recanted testimony presented at the motion for new trial hearing was not credible.

The Defendant submitted two affidavits with his amended motion for new trial. One affidavit was signed by the victim's mother, S.B., and stated that the victim had recently recanted. The second affidavit was signed by Tiffany Hatfield. In this affidavit, Ms. Hatfield questioned the validity of the victim's allegations based upon Ms. Hatfield's experience of being raped by a family member.

At the motion for new trial hearing, Ms. Hatfield testified that she was molested by her uncle at the age of eleven and that she had disclosed the details of the molestation to the victim. Hatfield stated that there were some differences in her experience and the victim's allegations, but there were some similarities such as their ages and that the perpetrator was

an uncle. She stated that she had "a little bit" of suspicion about the veracity of the victim's disclosure to her because "you're always suspicious when somebody tells you that." Ms. Hatfield stated that she was "never afraid" of the Defendant but that she was also "never alone" with him. She agreed that she never told law enforcement about the similarities between the victim's allegations and her experience. Ms. Hatfield disagreed with an assertion in her affidavit that she had a "sixth sense about sexual predators." She stated that she did not have any personal knowledge that the victim had lied about her encounters with the Defendant.

S.B. denied that the victim had ever told her that the victim's allegations against the Defendant were false. S.B. agreed that it was her signature on the affidavit but explained that she had not read the affidavit before signing it. S.B. stated that the only reason she agreed to meet with the Defendant's attorney was because she "wanted it over" and "to be able to talk to [her] family." S.B. stated that she had no reason to doubt the victim's trial testimony and maintained that the victim had never told S.B. that she fabricated the allegations against the Defendant. The victim maintained that she testified truthfully at trial. The Defendant's brother-in-law and sister-in-law testified that S.B. had told them that the victim had stated that the allegations were untrue.

At the conclusion of the hearing the trial court stated that it found the testimony offered by the Defendant not credible, describing the testimony as reflecting "the tortured history of this family" and "a painful aftermath of this trial." The trial court later issued a written order with the following findings:

> [T]he [D]efendant attacks the veracity of the victim's trial testimony. First defense witness Tiffany Hatfield inferred that the victim's claims were the product of Hatfield's experiences as a child rape victim, an account shared with the victim. Further, through affidavit of the victim's mother [S.B.], the [D]efendant claims that subsequent to trial the victim stated ". . . that she had not, in fact, been raped by [the Defendant] and that she testified falsely at [the Defendant's] trial". Other witnesses testified that they had heard this information, but not directly from the victim.

> Upon review, Hatfield's testimony is largely speculative regarding the victim's basis of testimony and lack of behavior indicating sexual abuse. Such information, without more, would be inadmissible at trial. Further, [S.B.]'s hearing testimony is markedly different from her affidavit. She denied her daughter's recantation and disclaimed reading the affidavit before signing. [S.B] ultimately inferred that she signed the affidavit in an effort to reestablish relations with her family.

Although the victim testified that she had told her mother the [D]efendant had not molested her, the context of the statement suggests her comment was the result of [S.B.]'s misguided attempt to restore family peace. The Court is satisfied that the victim's trial testimony is far more credible than any offered at this hearing. This claim raises no basis for retrial.

The test for granting a new trial in cases involving recanted testimony as newly discovered evidence is based on the following criteria:

A new trial may be granted because of recanted testimony when (1) the trial judge is reasonably well-satisfied that the testimony given by a material witness was false and that the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, was surprised by false testimony, or was unable to know of the falsity until after the trial; and (3) the jury might have reached a different conclusion had the truth been told. *State v. Mixon*, 983 S.W.2d 661, 666 (Tenn.1999)).

*State v. Housler*, 193 S.W.3d 476, 494 (Tenn. 2006). The decision as to whether to grant a motion for new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing *Hawkins v. State*, 417 S.W.2d 774, 778 (Tenn. 1967)).

Before a trial court can grant a new trial, it must find that the testimony given by the material witness was false at trial and the new testimony is true. After hearing S.B. and Ms. Hatfield's testimony and observing their demeanor at the hearing on the motion for a new trial, the trial court did not find these witnesses credible. At the hearing, both of these witnesses denied portions of the affidavits submitted in support of the Defendant's claim, discounting what little, if any, basis existed to support a finding that the victim's trial testimony was false. Accordingly, the trial court did not abuse its discretion in denying the Defendant's motion for new trial on this basis. The Defendant is not entitled to relief.

### C. Indictment

The Defendant contends that the indictment failed to provide enough specificity as to the dates of the two alleged offenses. The State responds that the Defendant has waived our review of this issue because he failed to challenge this defect prior to trial. We agree with the State.

Tennessee Rule of Criminal Procedure 12(b)(2) provides that a motion alleging a procedural defect in an indictment must be raised before trial. Rule 12(f) states that the

effect of the failure to object before trial is waiver. *See also Jackson v. State*, 475 S.W.2d 563, 565 (Tenn. Crim. App. 1971) (holding objections to the form of the indictment are generally waived by going to trial without first drawing the trial court's attention to the defect); *see also State v. Nixon*, 977 S.W.2d 119, 121 (Tenn. Crim. App. 1997) (holding that defects in the indictment that go to form, such as time of the offense, rather than substance must be raised prior to trial or result in waiver). Accordingly, the Defendant has waived our review of this issue for failure to raise an objection to the indictment before trial.

### D. Rebuttal Witness

The Defendant contends that the trial court erred when it allowed the State to call S.B. as a rebuttal witness for the "sole purpose of proving collateral matters by extrinsic evidence." The State points out that the Defendant's reliance on the "collateral fact rule" is inapplicable in this context and that the trial court properly allowed S.B. to testify to rebut P.S.'s testimony.

Our review of the trial transcript reveals that the Defendant failed to object to S.B.'s testimony at trial. Therefore, any alleged error is waived. *See* Tenn. R. Evidence 103(a)(1);Tenn. R. App. P. 36(a). The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE